# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

SALATA HOLDING COMPANY,
LLC,

                           :

         Plaintiff,

                                     **Case No. 2:20-cv-4529**

v.                                    **Judge Sarah D. Morrison**
                                               **Chief Magistrate Judge Elizabeth**
                                               **P. Deavers**

CHEPRI, LLC,                       :

         Defendant.

## OPINION AND ORDER

This matter is before the Court for consideration of Defendant Chepri, LLC's Motion to Dismiss. (Mot. to Dismiss, ECF No. 8.) Plaintiff Salata Holding Company, LLC has filed its response (Resp., ECF No. 10), and Chepri replied (Reply, ECF No. 12). For the reasons set forth below, Chepri's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**

## I.      FACTUAL BACKGROUND

All well-pled factual allegations in the Complaint (Compl., ECF No. 1) are considered as true for purposes of the Motion to Dismiss. *See Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016). The following summary draws from the allegations in the Complaint, and the documents integral to and incorporated therein.

## A. Engagement

Salata is a "fast-casual dining brand and franchisor" with approximately 85 locations across the country. (Compl., ¶ 7.) Its restaurants offer online ordering through a website and mobile app. (*Id*.) In 2019, "Salata sought to modernize and improve its consumer-facing technology suite, including its online ordering system, customer loyalty program, and mobile app." (*Id*., ¶ 9.) Salata engaged Chepri to assist in that effort. (*Id*., ¶ 10.)

On September 27, 2018, Chepri submitted a formal proposal for Salata's consideration, describing its experience and capabilities relevant to the envisioned "digital experience platform" ("DEP") (the "Proposal"). (Compl. Ex. A, ECF No. 1-1, PAGEID # 26–48.) The Proposal first identifies programming languages, database technologies, and third-party e-commerce services with which the Chepri team has experience. (*Id*., PAGEID # 28.) It then details Chepri's "process" for completing a development project. (*Id*., PAGEID # 30.) The Proposal then becomes specific to the Salata engagement, outlining its scope:

> [Salata] has engaged Chepri to build out their website . . . and integrate them with Olo's API for online ordering, DineEngineCMS and Paytronix/Punchh loyalty/rewards processing. Chepri will take [Salata's] artwork, direction and apply it to our user experience (UX) design and front-end framework. The goal is to enhance the customer ordering experience, increase online ordering by keeping the online ordering experience under the [Salata] domain, improved ordering flow, custom up-sells/cross-sells by product and improved awareness of the [Salata] brand.
>
> Chepri will custom develop the website and Online Ordering System UX using the Olo API with Agile/Scrum methodologies according to the client's goals, and priority of features. At the end of the project, [Salata] deliverables will include online ordering experience integrated under

the [Salata] domain, integrated with Olo and Paytronix/Punchh Advanced Loyalty Single Sign On (SSO).

. . .

The scope of work for the web project includes all planning, execution, implementation, and training for [Salata]. Chepri will be responsible for the design of the new web service based on content provided by [Salata] feedback also provided by [Salata]. Each stage of the project will require approval from [Salata] point of contact before moving on to the next stage. Chepri will provide resources for designing, building, testing, and implementing the new [Salata] ordering platform.

(*Id.*, PAGEID # 31.) The Proposal goes on to list project requirements and responses to questions posed by Salata. (*Id.*, PAGEID # 32–40.) Finally, the Proposal estimates a project timeline and associated costs. (*Id.*, PAGEID # 42–47.)

Attached to the Proposal is a document titled Terms of Service ("TOS"). (*Id.*, PAGEID # 49–51.) Section 1. of the TOS provides:

Subject to the terms and conditions set forth herein, Chepri, LLC aka DineEngine, an Ohio Limited Liability Company ("Chepri") agrees to provide the services as contained and outlined in the associated project breakdown above to the client. By both approving this document and providing an electronic signature, Client or Salata Holdings, LLC (1) agrees to pay the amount(s) set forth in the Payment Terms above, 2) confirms the accuracy of the Associated Project Costs, and 3) agrees to the following terms.

(*Id.*, PAGEID # 49.) Ten standard contracting provisions follow, including with respect to payment, termination, intellectual property rights, the parties' representations and warranties, etc. (*Id.*) The TOS bears the signature of a Salata representative, dated November 5, 2018. (*Id.*, PAGEID # 50.)

The Proposal also makes reference to a Master Service Agreement ("MSA"), under which Chepri would provide Salata with continuing service and support in exchange for a monthly retainer. (*See, e.g., id.*, PAGEID # 34.) In the Proposal,

3

Chepri "suggest[s] an annual [MSA] with a minimum allocation of 16 to 24 hours per month," and later provides a link to a standard MSA. (*Id.*, PAGEID # 34, 48. *See also* Compl. Ex. B, ECF No. 1-2.)

## B. Development

After the engagement was finalized, the parties began work developing Salata's re-designed DEP. In mid-February 2019, Salata provided digital artwork to Chepri for use on the platform. (Compl., ¶ 34.) By early April, Salata became concerned that Chepri's work had been delayed, and so engaged third-party consultant ExOpSol to help "shepherd" the project through to completion. (*Id.*, ¶ 28.) A series of botched encounters followed:

- On April 10, a Chepri representative told Salata that the project would be completed in early May with Olo certification by May 10. (*Id.*, ¶ 30.) On a call the next day, an Olo representative informed Salata that certification would take three to six weeks. (*Id.*, ¶ 31.)

- On April 11, Salata learned that Chepri was unaware that it had access to Olo's "Sandbox" development environment, and that Chepri had not yet initiated conversations with Paytronix about integration. (*Id.*, ¶¶ 31–32.)

- On April 19, Chepri and Salata had a call to discuss Chepri's failure to meet the UX design deadline. (*Id.*, ¶ 34.) The delay was allegedly caused by Chepri's failure to upload the digital artwork that Salata provided months earlier. (*Id.*)

- On April 30, Olo confirmed that Chepri had accessed Olo's Sandbox development environment. (*Id.*, ¶ 35.)

- On May 3, Chepri represented that its development work was 55–75% complete. (*Id.*, ¶ 36.)

- On May 9, Chepri began discussing integration with Paytronix. (*Id.*, ¶ 37.)

## C. Site Launch

In late-July, the parties decided to work towards a "rolling" launch of the platform. (*Id.*, ¶ 41.) During a roll-out for select locations the following week, however, it was discovered that group ordering was unavailable. (*Id.*, ¶ 42.) Chepri then advised that group ordering would be unavailable until all locations had launched. (*Id.*)

The re-designed website and online ordering system launched in full on September 19, 2019. (*Id.*, ¶ 44.) "Immediately upon launch, the online ordering site crashed for approximately one-half hour . . . , during which time no customers could access the site." (*Id.*) Group ordering was still unavailable, and the website did not allow customers to split payments or save payment options, despite those features being identified as requirements. (*Id.*, ¶¶ 42, 45.) Over the next month, the site crashed six more times. (*Id.*, ¶¶ 46–57.) Salata further alleges that, even when the site was working, the system had significant flaws in its functionality. (*Id.*, ¶ 58.)

## D. Post-Launch Support

After the September 19 launch, Salata submitted various support requests to Chepri. Salata alleges that Chepri "de-prioritiz[ed]" its support requests to pressure Salata into signing an MSA. (*Id.*, ¶ 59.) For example, in a "support ticket" dated October 22, 2019, Salata inquired about noticeable differences between Salata's site performance and that of other Chepri customers. (*Id.*, ¶ 60.) Chepri's CEO responded, in part, as follows:

> There are many reasons why there would be differences in performance, but most of our customers are in on-going agreements where we continue to improve all aspects of their product . . . . We can certainly

prioritize performance, among other additional features during a future
engagement.

(*Id.*, ¶ 61.) In another instance around the same time, Chepri simply "refused to
respond" to a series of support requests. (*Id.*, ¶ 63.)

## II.     PROCEDURAL BACKGROUND

Salata initiated this action on September 1, 2020. (ECF No. 1.) Its Complaint
asserts claims for breach of contract and the implied duty of good faith and fair
dealing (Count I), fraudulent misrepresentation (Count II), negligent
misrepresentation (Count III), and, in the alternative, unjust enrichment (Count
IV). (Compl., 19–22.) Chepri now moves to dismiss the Complaint under Federal
Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Mot. to Dismiss.) Specifically, Chepri
argues that the Complaint fails to allege that diversity jurisdiction exists, and fails
to state a claim for relief on each of the four counts. The Court will address each
argument, in turn.

## III.    SUBJECT-MATTER JURISDICTION

Chepri first argues that this Court lacks subject-matter jurisdiction. (*See*
Mot. to Dismiss, 8.) "In a diversity action, the plaintiff must state all parties'
citizenships such that the existence of complete diversity can be confirmed." *Vaughn
v. Holiday Inn Cleveland Coliseum*, 56 F. App'x 249, 250 (6th Cir. 2003) (internal
quotation and citation omitted). A limited liability company has the citizenship of
each of its members. *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th
Cir. 2009).

Salata alleges that its action is properly before the Court on diversity. (*See* Compl., ¶ 4.[1]) However, Salata's Complaint did not include sufficient information to determine whether complete diversity exists among the parties. As a result, the Court ordered Salata to file a notice supplementing its jurisdictional allegations. (ECF No. 18.) In response, Salata provided sufficient information for the Court to establish complete diversity of citizenship. (ECF No. 19.) The Court is satisfied that diversity jurisdiction exists. Accordingly, Chepri's motion to dismiss under Rule 12(b)(1) is **DENIED**.

## IV.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

---

[1] Although Paragraph 4 of the Complaint incorrectly references 28 U.S.C. § 1331 (federal question jurisdiction) instead of § 1332 (diversity jurisdiction), the error was clearly clerical.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

## V.    ANALYSIS

Chepri argues that Salata has failed to state a claim upon which relief may be granted. As more fully discussed below, Salata has plausibly stated a claim for breach of contract and fraudulent misrepresentation. However, the Complaint fails to state a claim for negligent misrepresentation. Finally, the existence of a valid contract between the parties bars Salata's unjust enrichment claim.

### A. The Complaint sufficiently pleads a claim for breach of contract and of the duty of good faith and fair dealing.

In its first claim, Salata alleges that Chepri's conduct amounted to a breach of contract. To establish a breach of contract claim under Ohio law, a plaintiff must plead facts establishing: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff. *Backus v. Bank of Am., N.A.*, 896 F. Supp. 2d 686, 693 (S.D. Ohio 2012) (Frost, J.) (quoting *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio Ct. App. 1994)). Salata asserts that Chepri breached the agreement between the parties (the "Agreement") by failing to provide a working DEP and by failing to provide 90 days of complimentary

post-launch support. (Compl., ¶¶ 86–87.) Chepri argues that Salata's Complaint fails to plausibly allege a breach of the contract terms and actionable damages. (Mot. to Dismiss, 9.)

The first element of a breach of contract claim is the existence of a contract. Although the parties disagree as to the scope of the Agreement, it is clear that a contract exists. The first element is therefore satisfied.

The second element—performance by the plaintiff—is also easily satisfied. Salata alleges that it paid Chepri $180,794.15 and participated in development of the DEP, including by providing artwork and other digital assets. (Compl., ¶¶ 23, 85.)

The third element—breach by defendant—requires additional analysis. Salata alleges that Chepri breached the Agreement by failing to provide a working DEP and failing to provide 90 days of complimentary post-launch support. (Compl., ¶¶ 86–87.) To determine whether this conduct constitutes a breach, the Court must first determine whether the terms of the Agreement impose upon Chepri the obligation to provide a working DEP and 90 days of complimentary post-launch support.

As noted above, the parties disagree about which terms comprise the Agreement. There is no dispute that the TOS constitutes a portion of the Agreement. The parties disagree about the extent to which the Proposal also forms a part of the Agreement. Under Ohio law, material can be incorporated by reference into a contract if that contract "explicitly, or at least precisely, identif[ies] the

written material being incorporated and . . . clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract." *Ewalt v. Gatehouse Media Ohio Holdings II, Inc.*, No 2:19-cv-4262, 2021 WL 825978, at *11 (S.D. Ohio Mar. 4, 2021) (Marbley, J.) (quoting *Volovetz v. Tremco Barrier Sols.*, 74 N.E.3d 743, 751–52 (Ohio Ct. App. 2016)) (original alteration omitted).

The TOS provides, in relevant part, as follows:

> [Chepri] agrees to provide the services as contained and outlined in the **associated project breakdown** above to [Salata]. By both approving this document and providing an electronic signature, [Salata] (1) agrees to pay the amount(s) set forth in the **Payment Terms** above, 2) confirms the accuracy of the **Associated Project Costs**, and 3) agrees to the [terms contains in the Terms of Service].
>
> . . .
>
> Chepri warrants that the Work Product will conform to the specifications set forth in the **Product Description**. Chepri does not warrant that the operation or use of the Work Product will be uninterrupted or error-free. CHEPRI EXCLUDES ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.
>
> [Salata] understands and acknowledges that Chepri uses Agile methodologies for projects, and therefore costs associated with sprints or iterations are based on an hourly rate of $139.99. A sprint can last up to 4 weeks and therefore the amounts listed in the **Product Details** are only a quote based on an estimate of the amount of time multiplied in hours by the hourly rate to determine what a working product will take to design, develop and deliver. Any remaining functionality, road-mapped, or backlogged items not included in such sprint would then be rolled over to future versions, including bugs, features, new functionality, changes and/or updates. Features are prioritized based on client requirements, with the highest prioritized items being planned, designed and developed first. CHEPRI DOES NOT GUARANTEE A WORKING PRODUCT EVEN AFTER A SPRINT IS COMPLETED. CHEPRI CAN ONLY PROVIDE ESTIMATED HOURS AND DELIVERY DATES BASED ON CLIENT'S REQUIREMENTS, WHICH

ARE SUBJECT TO CHANGE. CHEPRI DOES NOT GUARANTEE ANY DATE OR TIME OF DELIVERY.

(Compl. Ex. A., PAGEID # 49–50) (capitalization in original) (emphasis added). This language is important for two reasons: First, it supports Salata's proposition that the Proposal is incorporated into and comprises a part of the Agreement. The TOS does not define "associated project breakdown," "Payment Terms," "Associated Project Costs," "Product Description," or "Product Details." Although these terms do not precisely align with terms defined or used in the Proposal, it is clear from the context that they intend to reference the Proposal's content. Making all reasonable inferences in favor of the plaintiff, as it must, the Court will assume that the Proposal was incorporated in its entirety into the TOS and constitutes a portion of the Agreement.[2]

Second, the quoted language seems to support Chepri's position that it was not contractually obligated to deliver a working, error-free, or uninterrupted DEP. However, Salata alleges that Chepri failed to provide a functional final product *at all*. (Compl., ¶ 43.) The notion that Chepri was not obligated to do so defies common sense and is inconsistent with other portions of the Proposal which form a part of the Agreement. For example, the Proposal states that Salata "has engaged Chepri to build out their website . . . and integrate them with Olo's API for online ordering,

_____

[2] It is not reasonable to infer that the MSA comprises a part of the Agreement. Salata alleges only that it "accessed" the "standard Master Services Agreement" linked in the Proposal. The terms of that standard MSA make clear that it was not a part of the original Agreement between the parties, and required additional action in order to take effect. (*See* Compl. Ex. B., ECF No. 1-2, PAGEID # 59 ("This is an ancillary agreement for additional scope items falling outside of the original proposed scope and for on-going work.").)

DineEngineCMS and Paytronix/Punchh loyalty/rewards processing." (Compl. Ex. A., PAGEID # 31.) It further defines the scope of work to "include[] all planning, execution, implementation, and training" for the DEP, based on feedback and approval from Salata. (*Id.*) Salata has plausibly alleged that Chepri breached these provisions of the Agreement by failing to provide a working DEP after project-completion.

Salata also alleges that Chepri breached the Agreement by failing to provide 90 days of complimentary post-launch support. Salata further alleges that Chepri breached the "implied covenant of good faith and fair dealing" when it subordinated Salata support tasks because Salata did not enter into an MSA with Chepri. Under Ohio law, "[t]he parties to a contract are required to use good faith to fill the gap of a silent contract." *Burlington Res. Oil & Gas Co. v. Cox*, 729 N.E.2d 398, 547 (Ohio Ct. App. 1999). "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank*, 662 N.E.2d 1074, 1082–83 (Ohio 1996) (quotation omitted). "What the duty of good faith consists of depends upon the language of the contract in each case which leads to an evaluation of reasonable expectations of the parties." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 764 (6th Cir. 2008).

In the Proposal, which constitutes a part of Agreement, Chepri stated: "We will provide 90 days complimentary support post-launch for any bugs/issues related

to the finished product." (Compl. Ex. A, PAGEID # 34.) The Agreement is silent as to how or at what level the complimentary support would be provided. The Complaint indicates that Chepri indeed provided *some* support post-launch (*see, e.g.*, Compl., ¶¶ 47–48)—but alleges that Chepri withheld post-launch support at key points to pressure Salata into executing an MSA. Based on these allegations, it would not be unreasonable for a fact-finder to conclude that Chepri contravened the purpose underlying the post-launch support provision of the Agreement and took opportunistic advantage of its silence by trying to leverage the complimentary support into an ongoing services agreement. *See Huntington Nat'l Bank v. Deluxe Fin. Servs., Inc.*, No. 2:14-cv-250, 2014 WL 4987597, at *4 (S.D. Ohio Oct. 6, 2014) (Smith, J.) (clarifying that the court cannot "conclusively resolv[e]" the issue of good faith on a motion to dismiss, but must look instead to whether the allegations can reasonably be found by a trier of fact to constitute a breach). Salata has plausibly alleged the third element of a breach of contract claim with respect to post-launch support services.

Finally, as to the fourth element—damage or loss to plaintiff—Chepri argues that the only damages plausibly alleged in the Complaint were expressly waived by Salata. (Mot. to Dismiss, 14.) Salata alleges that it suffered at least $280,431.85 in damages, including the $180,794.15 that Salata paid to Chepri, plus alleged reputational harm and expenses incurred as the result of crashes, downtime, and the ExOpSol engagement. (*See id.*, ¶¶ 72–75, 88.) The Agreement expressly limits Chepri's liability to exclude lost profits, special damages, or consequential damages.

(Compl. Ex. A, PAGEID # 50.) General damages are measured by "the loss in the value to [the injured party] of the other party's performance caused by its failure or deficiency," while consequential damages arise from "any other loss . . . caused by the breach." *See* Restatement (Second) of Contracts § 347 (Am. Law Inst. 1981). Under Ohio law, a contractual waiver of consequential damages may be upheld "where there is no great disparity of bargaining power between the parties . . . ." *Zaremba v. Marvin Lumber and Cedar Co.*, 458 F. Supp. 2d 545, 549 (N.D. Ohio 2006) (quoting *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 639 (Ohio 1989)). No such disparity is alleged or apparent here. Although certain components of the claimed damages will be barred by the terms of the Agreement, the Court finds that the Complaint plausibly alleges that Salata suffered harm in the form of general damages due to Chepri's alleged breach.

Chepri's motion to dismiss Count I of the Complaint is **DENIED**.

## B. The Complaint sufficiently pleads a claim for fraudulent misrepresentation.

In Count II of its Complaint, Salata alleges that Chepri fraudulently inflated its experience developing online ordering systems like the one Salata engaged it to produce. (Compl., ¶¶ 90–92.) To state a claim of fraudulent misrepresentation under Ohio law, a plaintiff must show

> (a) a representation . . . , (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation. . ., and (f) a resulting injury proximately caused by the reliance.

14

*Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 505 (6th Cir. 2003) (citation omitted). The claim commonly involves "some collateral misrepresentation designed to induce the plaintiff into the contract." *Aero Fulfillment Servs. Corp v. Oracle Corp.*, 186 F. Supp. 3d 764, 775 (S.D. Ohio 2016) (Black, J.). A plaintiff who brings a fraud claim must plead "with particularity the circumstances constituting the fraud . . . ." Fed. R. Civ. P. 9(b). To satisfy this heightened pleading standard, a plaintiff must "allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Aero Fulfillment*, 186 F. Supp. 3d at 776 (quoting *U.S. ex rel. Marlar v. BWXT Y-12 LLC*, 525 F.3d 439, 444 (6th Cir. 2008)). In other words, the plaintiff must plead sufficient detail "to allow the defendant to prepare a responsive pleading." *Id.* (quoting *MyVitaNet.com v. Kowalski*, No. 2:08-cv-48, 2008 WL 2977889, at *5 (S.D. Ohio July 29, 2008) (Frost, J.)).

Salata alleges, "[u]pon information and belief," that Chepri misrepresented "its experience and expertise in successfully developing online ordering systems for restaurants, and with Olo and Paytronix integration[.]" (Compl., ¶ 65–71.) In Salata's view, its experience with Chepri casts doubt on the veracity of several representations made throughout the Agreement. For example, Chepri represented in the Proposal that it "ha[d] over 5 years of UX development for OLO customers, and [was] an OLO UX Partner." (*Id.*, ¶ 70.) But, in an April 2019 development call with representatives of Salata, Olo, and Chepri, the Chepri developer was unaware that he even had access to Olo's development environment. (*Id.*, ¶ 31.) As Chepri

rightly points out, a fraud claim pled on information and belief is permissible only if the pleading "set[s] forth a factual basis for such relief" that goes beyond "speculation and unsupported conclusion[s.]" *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006) (citation omitted). Although the facts distilled through discovery may not support an ultimate finding of fraud, Salata's Complaint pleads the claim with sufficient particularity.

Chepri's motion to dismiss based on failure to state a fraudulent misrepresentation claim is **DENIED**.

### C. The Complaint fails to plead a claim for negligent misrepresentation.

Salata also alleges that those representations give rise to a claim of negligent misrepresentation. (Compl., ¶¶ 96–102.) The Ohio Supreme Court defines negligent misrepresentation to be:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989) (citation omitted). Chepri argues that the claim must fail, because Chepri and Salata do not have the "special fiduciary-type relationship" necessary to support a negligent misrepresentation claim. (Mot. to Dismiss, 18) (citing *Austin-Hall v. Woodard*, No. 3:18-cv-270, 2020 WL 5943018, at *9 (S.D. Ohio Oct. 7, 2020) (Rice, J.)). The Court agrees.

The Ohio Supreme Court first recognized the claim of negligent misrepresentation in *Haddon View Inv. Co. v. Coopers & Lybrand*, 436 N.E.2d 212 (Ohio 1982). The *Haddon View* Court held that accountants could be liable to a third-party (*i.e.*, not the accountant's client) for negligence where the third-party "is a member of a limited class whose reliance on the accountant's representations is specifically foreseen." *Id*. at 215. The Court applied the Restatements (Second) of Torts § 552 to impose a duty upon the accountants as to the limited partners of a partnership for which the accountants provided professional services. *Id*. at 214, n. 1. That section provides, in relevant part, as follows:

> (1) One who, in the course of his business . . . or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> (2) . . . the liability stated in Subsection (1) is limited to loss suffered

>> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

>> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction. . . .

The Ohio Supreme Court reiterated its adoption of the Restatement definition of negligent misrepresentation in *Gutter v. Dow Jones, Inc.*, 490 N.E.2d 898, 900 (Ohio 1986). The *Gutter* Court focused on the claim's limits, holding that a newspaper was not liable to its general readership for negligence in publishing incorrect information because the reader "does not fall within a special limited class

(or group) of foreseeable persons" as set forth in § 552(2)(a). The Court contrasted the universe of Wall Street Journal readers with the narrow class of "identifiable and foreseeable group of limited partners" whose claim was permitted to proceed in *Haddon View*. The Court later described this limitation as a "nexus . . . that can serve as a substitute for contractual privity." *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n*, 560 N.E.2d 206, 211 (Ohio 1990) (citation omitted).

Twenty years after *Gutter*, the Ohio Supreme Court discussed its holding in *Haddon View*, and indicated that the negligent misrepresentation claim was limited to circumstances of professional negligence:

> In *Haddon View*, this court discussed the liability of an accountant for professional negligence in accord with 3 Restatement of the Law 2d, Torts (1979), Section 552. That section recognizes professional liability, and thus a duty in tort, only in those limited circumstances in which a person, in the course of business, negligently supplies false information, knowing that the recipient either intends to rely on it in business, or knowing that the recipient intends to pass the information on to a foreseen third party or limited class of third persons who intend to rely on it in business. Liability in *Haddon View* was based exclusively upon this discrete, preexisting duty in tort and not upon any terms of a contract or rights accompanying privity.

*Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc.*, 835 N.E.2d 701, 704–05 (Ohio 2005) (internal citations omitted).

The *Corporex* Court may be said to recognize that a negligent misrepresentation claim cannot sustain without first identifying a duty owed—and that professionals owe such a duty to those who may reasonably and foreseeably rely on their work product. *Cf. Floor Craft*, 560 N.E.2d at 213–14 (Brown, J., dissenting) (limiting *Haddon View* to professional malpractice causing economic loss to a foreseeable plaintiff). In this view, although situated in a larger discussion of

the "economic loss rule,"[3] the *Corporex* clarification of the *Haddon View* holding broadly establishes the "duty" necessary to bring a successful claim sounding in negligence.

Both before and after *Corporex*, federal courts have split on whether Ohio law requires a special relationship to sustain a claim for negligent misrepresentation. For example, in *Nat'l Mulch and Seed, Inc. v. Rexius Forest By-Products Inc.*, No. 2:02-cv-1288, 2007 WL 894833 (S.D. Ohio Mar. 22, 2007) (Holschuh, J.), the plaintiff alleged that the defendant negligently misrepresented the capabilities of mulch blower trucks that it sold to plaintiff. Defendant moved for summary judgment on the claim, arguing both that it was barred by the economic loss rule and that plaintiff failed to establish the "special relationship" required to sustain a negligent misrepresentation claim. Judge Holschuh discussed *Corporex* in analyzing the economic loss rule argument. *See Id.* at *7. But he did not discuss *Corporex* in his discussion the special relationship argument, deciding instead:

> [A] special relationship is not a formal element of a negligent misrepresentation claim under Ohio law. Instead . . . , in order to assert a negligent misrepresentation claim under Ohio law, a plaintiff must establish that the defendant supplied false information for the guidance of the plaintiff in its business transactions, that the plaintiff was justified in relying on the information, and that the defendant failed to exercise reasonable care or competence in obtaining and/or communicating the information. *Delman*, 41 Ohio St.3d at 4.
>
> To the extent Ohio courts discuss a special relationship in connection with a negligent misrepresentation claim, the discussion appears to be related to the requirement that a defendant supply false information for

---

[3] "The economic-loss rule generally prevents recovery in tort of damages for purely economic loss." *Corporex*, 835 N.E.2d at 704 (citations omitted). The *Haddon View* Court recognized an exception to the economic loss rule where the loss was caused by a party owing a duty in tort to the aggrieved party. *See id.* at 704–05.

the guidance of the plaintiff in its business transactions. The "for the guidance of" language directs the court's attention to the duty owed and serves to limit the class of potential plaintiffs. As explained by the Supreme Court of Ohio, liability for negligent misrepresentation is limited to "the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it." *Gutter v. Dow Jones, Inc.*, 22 Ohio St.3d 286, 288 (1986); accord *Haddon View*, 70 Ohio St.2d at 157 (not requiring any special relationship but limiting liability to misrepresentations made to a foreseeable class of persons). "A contrary result would in effect extend liability to all the world and not a limited class . . . ." *Gutter*, 22 Ohio St.3d at 289.

*Id.* at *9 (internal footnote omitted). Following this analysis, which looks at the size of the audience to whom the representations were made instead of the nature of the parties' relationship, Judge Holschuh denied summary judgment and allowed the negligent misrepresentation claim to proceed.

In contrast, the Northern District of Ohio concluded that "a claim for the tort of negligent misrepresentation arises from a contract between two sophisticated parties acting at arm's length." *Picker Int'l, Inc. v. Mayo Found.*, 6 F. Supp. 2d 685, 686 (N.D. Ohio 1998). Judge Gwin explained the law as he understood it:

A core requirement [to maintain a negligent misrepresentation claim] is a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transactions. This relationship occurs only in "special" circumstances. Usually the defendant is a professional (*e.g.*, an accountant) who is in the business of rendering opinions to others for their use in guiding their business, and the plaintiff is a member of a limited class. *Haddon View Inv. Co. v. Coopers & Lybrand*, 70 Ohio St.2d 154, 157, 436 N.E.2d 212 (1982); *Gutter v. Dow Jones, Inc.*, 22 Ohio St.3d 286, 288–89, 490 N.E.2d 898 (1986). This "special" relationship does not exist in ordinary business transactions. *Id.*

*Id.* at 689. As recently as last year, this Court also concluded that a special relationship is necessary to maintain a negligent misrepresentation claim. *Austin-Hall*, 2020 WL 5943018, at *9.

Since *Picker* and *National Mulch*, courts have had ample occasion to consider whether a special relationship—one beyond that found in a typical business transaction—is necessary to maintain a claim for negligent misrepresentation. Unfortunately, the resulting body of case law is starkly divided between those that answer "no, a special relationship is not required"—*see, e.g., Pacifica Loan Five, LLC v. Fifth Third Bank*, 1:09-cv-930, 2011 WL 13228111, at *10–11 (S.D. Ohio Apr. 14, 2011) (Barrett, J.) (following *Nat'l Mulch*, declaring *Picker* and its progeny as "flatly incorrect"); *Hodell-Natco Indus., Inc. v. SAP Am., Inc.*, 13 F. Supp. 3d 786, 797 (N.D. Ohio 2014) (following *Nat'l Mulch*); *Crooksville Family Clinic, Inc. v. Quest Diagnostics, Inc.*, 2:16-cv-1145, 2019 WL 6715941, at *11–12 (S.D. Ohio Dec. 10, 2019) (Morrison, J.) (same)—and those that answer "yes, a special relationship is required"—*see, e.g., Ziegler v. Findlay Indus., Inc.*, 464 F. Supp. 2d 733, 738 (N.D. Ohio 2006) (following *Picker*); *Doe v. SexSearch.com*, 551 F.3d 412, 418 (6th Cir. 2008) (noting that courts require "a special relationship under which the defendant supplied information to the plaintiff for the latter's use in its business transaction") (citation omitted); *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 840–41 (6th Cir. 2012) (citing *Picker* to note that Ohio courts extend liability for negligent misrepresentation when a "third part[y] closely linked to a person in privity with the defendant could reasonably be expected to rely on

information the defendant provide to that person"); *Austin-Hall*, 2020 WL 5943018, at *9 ("a claim of negligent misrepresentation arises only in the context of a special, fiduciary-type relationship between the parties"); *Li-Conrad v. Curran*, 50 N.E.3d 573, 578 (Ohio Ct. App. 2016) (negligent misrepresentation "is considered a business tort that is not meant to have extensive application" and is limited to "'fiduciary-like' relationship[s]"). The Court cannot discern so much as a thread of through-line connecting the divergent law.

Despite the apparent split on the topic, the Court is persuaded that, under Ohio law, the tort of negligent misrepresentation is not intended to provide relief in a case such as this one. Foremost, Salata and Chepri are in privity of contract with one another; the contract accordingly provides Salata with a basis for relief. *See Corporex*, 835 N.E.2d at 704–05 ("When a duty in tort exists, a party may recover in tort. When a duty is premised entirely upon the terms of a contract, a party may recover based upon breach of contract."); *Floor Craft*, 560 N.E.2d at 211 (Ohio 1990). Further, if a special relationship is indeed required, it is not present. Chepri is not alleged to be in the business of providing guidance to others in such a way that it would owe Salata any special duty. *See Ohio Police & Fire Pension Fund*, 700 F.3d at 840–41 (citing *Haddon View* and *Picker* to support the proposition that the defendant in a negligent misrepresentation claim is typically a professional "who is in the business of rendering opinions to others for their use in guiding their business"); *Levy v. Seiber*, 57 N.E.3d 331, 340 (Ohio Ct. App. 2016) (negligent misrepresentation requires that a "defendant [] is in the business of supplying

information" and a "plaintiff seek guidance with respect to [a] business transaction, such as when there is a special relationship between the parties").

Chepri's motion to dismiss the negligent misrepresentation claim is **GRANTED**.

### D. Salata's unjust enrichment claim cannot proceed.

Fourth, and in the alternative, Salata alleges that Chepri was unjustly enriched in the amount of $180,794.15 (the amount Salata paid to Chepri). (Compl., ¶¶ 104, 107.) To establish a claim of unjust enrichment, a plaintiff must allege

> (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment.

*Foster v. Health Recovery Servs., Inc.*, 2:19-cv-4453, 2020 WL 5943021, at *12 (S.D. Ohio Oct. 7, 2020) (Marbley, J.) (quoting *Dailey v. Craigmyle & Son Farms, L.L.C.*, 894 N.E.2d 1301, 1309 (Ohio Ct. App. 2008)). However, "[w]here the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for . . . unjust enrichment." *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 181 (6th Cir. 1996). That is precisely the scenario here. Chepri's motion to dismiss based on failure to state an unjust enrichment claim is **GRANTED**.

## VI.     CONCLUSION

For the reasons stated herein, the Court **GRANTS IN PART** and **DENIES IN PART** Chepri's Motion to Dismiss. Counts III and IV of Salata's Complaint are hereby **DISMISSED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**